# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Case No. _____**

DANIEL O. HARTENSTINE
[address to be filed under seal]

        Petitioner,

   v.

UBER TECHNOLOGIES, INC.
1515 3rd Street
San Franciso, CA 94158,

        Defendant.

_____/

## PETITION TO COMPEL ARBITRATION AND APPOINT AN ARBITRATOR

Pursuant to Sections 4 and 5 of the Federal Arbitration Act ("FAA"), Petitioner Daniel O. Hartenstine ("Plaintiff") petitions the Court for an order (1) compelling arbitration against Defendant Uber Technologies, Inc. ("Uber") under its U.S. Terms of Use and (2) appointing JAMS in Washington, DC as the arbitration provider.

### INTRODUCTION

Uber connects prospective passengers with its worldwide network of drivers using a mobile application that it represents to its U.S. consumers is the same wherever it is used. It advertises these services with promises of "safe" transportation. In reality, however, Uber misrepresents this safety. Plaintiff relied on Uber's promises but suffered injuries when his Uber driver sped off before he had finished getting in the car. With half of Plaintiff's body still hanging outside, the driver accelerated, dragging Plaintiff 20 feet across the pavement.

1

These events have given rise to a dispute, the resolution of which is subject to Uber's U.S. Terms of Use—the only terms Plaintiff has ever agreed to. Those terms require an informal pre-arbitration dispute resolution process (something like an informal mediation), which Plaintiff duly initiated. Though Uber willingly participated in this process, no resolution was reached. Thus, as required under the U.S. Terms of Use, Plaintiff conferred with Uber regarding the selection of an arbitration provider. Uber failed to respond to any of Plaintiff's written requests for conferral. Confronted with Uber's silence, Plaintiff filed a demand for arbitration before JAMS in Washington, DC. Uber subsequently filed an objection, asserting for the first time that different terms and conditions (which mandated arbitration in the Netherlands) applied. Despite several requests by JAMS, Uber failed to provide an English-language version of the terms and conditions it claims applies. JAMS then closed the file, concluding: "in light of [Uber's] objection and absent a court order or express agreement of the parties, JAMS declines to administer this case."

Accordingly, Plaintiff seeks a Court order compelling arbitration before JAMS in Washington, DC.

FACTUAL BACKGROUND[1]

**A. The Parties.**

1.      Plaintiff is a resident of the District of Columbia. *See* Ex. A [Decl. of Daniel O. Hartenstine] at ¶ 2. He downloaded the Uber app years ago in the U.S. and regularly used Uber's services in the District of Columbia and throughout the U.S. *See id.* at ¶ 3.

2.      Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. It operates throughout the U.S. and internationally in approximately 70 countries and 10,000 cities.

**B. Jurisdiction and Venue.**

3.      The Court has subject matter jurisdiction. Were Plaintiff to pursue his claim in federal court in the first instance, diversity jurisdiction would exist under 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Indeed, Plaintiff's medical expense alone exceed $75,000. *See* Hartenstine Decl. at ¶ 9.

4.      Because the Court would have diversity jurisdiction over the underlying case, it has jurisdiction over a request to compel arbitration. *See* 9 U.S.C. § 4 (conferring jurisdiction upon federal district courts to resolve motions to compel

---

[1]      Requests to compel arbitration are evaluated under the summary judgment standard of Federal Rule of Civil Procedure 56. *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). Where appropriate, facts in this Petition are supported by exhibits and should be construed as undisputed.

arbitration in instances where a court would otherwise "have jurisdiction under title 28, in a civil action[.]"). It also has jurisdiction to appoint an arbitration provider. *See* 9 U.S.C. § 5 (granting federal courts the power to "designate and appoint an arbitrator[.]").

5.      The Court has personal jurisdiction over this matter. Upon information and belief, Uber is registered to do business in the District of Columbia and does business in the District of Columbia, including marketing its ridesharing app and linking consumers with its network of drivers.

**C. The Underlying Allegations.**

**a.  Uber's Safety Representations.**

6.      Plaintiff claims that Uber negligently misrepresented its safety to riders, like himself, to induce them to use their app, including in foreign countries.

7.      The app itself is a mobile ridesharing service that provides drivers to customers on demand in cities around the world. Uber's website explains: "Our technology helps people connect and move in over 70 countries and 10,000 cities around the world."[2]  It further encourages customers to "[u]se Uber in cities around the world.  Get to your destination in more than 10,000 cities."[3]

8.      The Uber app is free to download and install on a smartphone, and it can be used internationally in over 70 countries and 10,500 cities, including Mexico

---

[2]      https://www.uber.com/us/en/about/uber-offerings/ (last visited Jun. 24, 2024).

[3]      https://www.uber.com/global/en/cities/ (last visited Jun. 24, 2024).

City, Mexico. In fact, when it comes to the use of the mobile app when traveling, Uber's U.S. website specifically proclaims "[w]herever you go, the Uber you know."[4] This aligns with statements about the use of the Uber app abroad on Uber's own blog, in which Uber represents: "there's no need to download additional ridesharing apps or figure out how to hail a car in a foreign country. Just open your Uber app and enjoy the ride."[5] "No matter where you go," Uber continues, "the Uber app always stays the same."[6]

9.     To sell its services, Uber heavily markets the safety of its ridesharing service to its consumers like Plaintiff and induces them to use its services worldwide with the false expectation of safety.  Uber falsely advertises, markets, and holds itself out as a safer, better alternative to other methods of transportation. It targets consumers via various advertising and marketing campaigns which promote Uber as the "safest ride on the road."

10.     Specifically, on its Safety webpage for Mexico, Uber makes statements concerning the superior safety of Uber rides: "Choose more safety. Choose Uber."[7] On its blog, which is easily accessible from its website, Uber represents that "[t]he Uber

---

[4]     https://www.uber.com/us/en/u/ride-while-traveling/ (last visited Jun. 24, 2024).

[5]     https://www.uber.com/blog/5-ways-uber-makes-last-minute-travel-plans-less-stressful/ (last visited June. 24, 2024).

[6]     https://www.uber.com/en-NL/blog/how-the-uber-app-makes-travelling-abroad-easier/ (last visited Jun. 24, 2023).

[7]     https://www.uber.com/mx/en/safety/ (last visited June 24, 2024).

app is the *safest* way to get around a new city" and "[e]very time you ride using the Uber app, you can be sure that you're riding with a trusted driver-partner in a reliable vehicle." (Emphasis added.)[8] Also on its blog, Uber represents that "[w]e're happy to help you get from A to B *as comfortably and safely as possible* in any part of the world, so that you can fully enjoy your well-deserved holiday." (Emphasis added.)[9] On its website, Uber also markets its commitment to safety with statements like: "[w]e embed safety into everything we do," "[t]he Uber platform was built with safety in mind," "[s]afer journeys for everyone," and "[h]elping keep people safe is a huge responsibility and one we do not take lightly."

11.     Uber also represents to consumers like Plaintiff that it subjects its drivers to rigorous and robust screening procedures prior to allowing them to drive for Uber.  For example, Uber asserts on its website that "[e]veryone who drives with Uber is screened before their first trip" and "[i]n addition, Uber reruns these driver screening at least every year  and uses technology to look for issues in between."[10] On its blog, Uber also states: "[b]efore drivers can start driving on the Uber platform, we perform a thorough background check.  You can count on the fact that any driver who picks you up via the app has been verified by us."[11]

---

[8]     *See* n. 5, *supra.*

[9]     https://www.uber.com/en-NL/blog/travel-safe-uber-abroad/ (last visited Jun. 24, 2024).

[10]    https://www.uber.com/us/en/ride/safety/driver-screening/ (last visited Jun. 24, 2024).

[11]    *See* n. 5, *supra.*

12.    Uber induces passengers to use its services with the expectation of safety when, in reality, Uber takes a hands-off approach when it comes to driver-passenger interactions and its services are no different or better than those performed by other companies and competitors that offer passenger transportation services.

**b. Plaintiff Relies on Uber's Safety Representations.**

13.    Relying upon Uber's prior representations, made in the U.S. (including the District of Columbia), that Uber would provide safe and reliable transportation and safe and reliable drivers, including in cities abroad, Plaintiff and his family decided to use Uber's services while traveling in Mexico City. *See* Hartenstine Decl. at ¶ 10.

14.    Plaintiff's father used the Uber app on his cell phone to order an Uber vehicle. *See id.* at ¶ 5. When the Uber vehicle arrived, Plaintiff's father and mother entered first, sitting in the backseat behind the driver and in the middle seat. Once Plaintiff's mother and father were seated, Plaintiff attempted to enter the vehicle next. When Plaintiff was halfway into the backseat, with the car door still open, the Uber driver suddenly sped away. *See id.* at ¶ 6.

15.    Plaintiff was dragged approximately 20 feet while one of his legs was inside the car, stuck under the back of the front passenger seat, and his other leg was outside the vehicle dragging on the pavement. While the car sped away, Plaintiff held onto the door frame to prevent himself from being ejected from the car entirely and yelled at the Uber driver to stop. When the car finally slowed, Plaintiff was able to get entirely into the vehicle. *See id.* at ¶ 7.

7

16.    Plaintiff sustained extensive injuries to his leg and hip, including, but not limited to, severe pain in his leg radiating from his hip, difficulty standing, sitting, and walking, and a fracture in his left hip. As a result, Plaintiff received corticosteroid injections in his left hip and was prescribed medication to manage the pain. He was also required to undergo physical therapy to address the pain and difficulty moving and subsequently underwent surgery for a left total hip replacement. *See id.* at ¶ 8.

**D. Uber U.S.'s Terms of Use.**

17.    Uber's Terms and Conditions contain an Arbitration Agreement, which provides, in relevant part:

> [Y]ou and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury or death to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless of whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to these Terms, and regardless of whether you allege that the personal injury or death was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

*See* Ex. B [Decl. of Stephanie A. Casey, Esq.] at Ex. 1, Section 2(a)(1).[12]

18.    The Arbitration Agreement also includes a delegation clause, which provides that:

---

[12]    *See also* https://www.uber.com/legal/en/document/?name=general-terms-of-use&country=united-states&lang=en (last visited Jun. 24, 2024).

Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel.

*Id.*, Section 2(a)(4).

19.    The Arbitration Agreement sets forth the process for adjudicating claims.   First, before either party can demand arbitration against the other, the parties must complete an informal dispute resolution conference. The party initiating the claim must give notice to the other party in writing of their intent to initiate an informal dispute resolution conference. Following the conclusion of the information arbitration process, should the parties not resolve the dispute, "a party must provide the other party with a written demand for arbitration and file the demand with the applicable arbitration provider, as determined by Section 2(c)." Casey Decl. at Ex. 1, Section 2(d). Section 2(c) provides that, for disputes arising outside of California:

the parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises.

*Id.*, section 2(c).

9

**E.  The Pre-Arbitration and Arbitration Process.**

20.    On November 16, 2023, Plaintiff, through counsel, sent Uber a written notice of intent to initiate an informal dispute resolution conference, as required by Uber's Arbitration Agreement. *See* Casey Decl. at Ex. 2. Having received no response, Plaintiff sent a follow-up letter on December 7, 2023. *See id.* at Ex. 3. On December 8, 2023, Plaintiff received a communication indicating that negotiations with Uber would be accomplished with counsel for Uber's insurance carrier. *See id.* at Ex. 4. The parties then engaged in the informal dispute resolution process.

21.    Following the 60-day period for the informal dispute resolution process, on January 19, 2024, Plaintiff sent Uber a demand to initiate arbitration. Uber did not respond to Plaintiff's request for conferral regarding the selection of an arbitration provider. On January 23, 2024, Plaintiff sent a follow-up letter requesting a conferral to select an arbitration provider so that a demand for arbitration could be filed with the mutually acceptable arbitration provider. *See id.* at Ex. 6. Uber again did not respond. On February 1, 2024, Plaintiff sent another letter, this time proposing the selection of JAMS as the arbitration provider for this matter. *See id.* at Ex. 7. Plaintiff noted that, should he not hear from Uber within fourteen days, he would assume that Uber consented to the choice of JAMS as the arbitration provider for this matter and he would file his arbitration demand accordingly. Uber did not respond.

22.    Accordingly, on February 20, 2024, Plaintiff filed a demand for arbitration on Uber. *See id.* at ¶ 12. The arbitration could not be formally commenced

(and therefore an arbitrator could not be selected), because Uber refused to pay its portion of the filing fee.

23.    On April 19, 2024, Uber objected to JAMS as the arbitration provider, contending that a different entity (Uber B.V.) and its arbitration agreement (written in Spanish) applied. *See id*. at ¶ 13. JAMS instructed Uber to provide an English-translation version of the Uber B.V. Terms and Conditions.  *See id*. at ¶ 14. Uber did not do so.  *See id*. On June 21, 2024, JAMS administratively closed the file, concluding: "in light of [Uber's] objection and absent a court order or express agreement of the parties, JAMS declines to administer this case." *See id*. at Ex. 8.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**Legal Standard**</u>

"Generally, a party seeking to compel arbitration must show that a valid arbitration clause exists, that the movant is entitled to invoke the clause, that the other party is bound by the clause, and that the clause covers the asserted dispute." *Partridge v. Am. Hosp. Mgmt. Co., LLC*, 289 F. Supp. 3d 1, 16 (D.D.C. 2017). Motions to compel arbitration are treated as a "a request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate[,]" *Aliron*, 531 F.3d at 865, and so are "examined under the summary judgment standard of Federal Rule of Civil Procedure 56(c)." *Andresen v. IntePros Fed., Inc.*, 240 F. Supp. 3d 143, 148 (D.D.C. 2017).

Because the FAA "strongly favors the enforcement of agreements to arbitrate as a means of securing 'prompt, economical and adequate solution of controversies[,]"

*Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 479–80, (1989), courts must resolve doubts in favor of arbitrability. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

<u>Argument</u>

**A. The Parties Have Entered into a Valid and Enforceable Arbitration Agreement, But in Any Event, That Question Is for an Arbitrator.**

Resolving a motion to compel arbitration involves a two-pronged inquiry. First, the court must decide "whether the parties entered into a valid and enforceable arbitration agreement." *Olle v. 5401 W. Ave. Residential, LLC*, 569 F. Supp. 2d 141, 144-45 (D.D.C. 2008). Ordinarily, courts assume that parties intend for courts—not arbitrators—to resolve threshold "arbitrability issues," including "questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Sakyi v. Estee Lauder Companies, Inc.*, 308 F. Supp. 3d 366, 377 (D.D.C. 2018) (citations omitted). But the parties can avoid this presumption by "clearly and unmistakably provid[ing] otherwise" through a delegation clause *Skrynnikov v. Fed. Nat'l Mortg. Ass'n*, 943 F. Supp. 2d 172, 176 (D.D.C. 2013). That is the case here.

As noted (and quoted) above, the Uber U.S. Terms of Use contain an unequivocal arbitration provision—its terms require "any dispute, claim, or controversy" that in anyway "arise[s] out of or relate[s]" to the Terms and Conditions, including their "enforcement, interpretation, [and] scope," to be settled "by binding individual arbitration[.]" Casey Decl. at Ex. 1, Section 2(a)(1). Such straightforward terms have routinely supported binding and enforceable arbitration agreements. *See,*

12

*e.g.*, *Olle*, 569 F. Supp. 2d 145 (valid agreement called for the arbitration of "any dispute, controversy, or claim" arising from a condominium purchase contract); *Nelson v. Insignia/Esg, Inc.*, 215 F. Supp. 2d 143, 145 (D.D.C. 2002) (valid agreement required arbitration of "[a]ny dispute arising out of or relating to this Agreement, [the employee's] performance or the Company's performance thereunder, the terms and conditions of ... employment by the Company, and/or the termination of such employment[.]").

This clear language, coupled with Petitioner's assent to its terms, should resolve the inquiry in favor of arbitration. But in case there was any doubt, the agreement goes further: it provides that "[o]nly an *arbitrator*, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. *An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable*[.]" *Id.*, Section 2(a)(4) (Emphasis added.) Such language makes clear that the existence of a valid agreement is an issue for an arbitrator. *See W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F.Supp.3d 158, 167 (D.D.C. 2014) (finding similarly "broad, all-encompassing language" is "clear evidence that the parties agreed to arbitrate all issues" arising between them, including the question of arbitrability); *see also Micheletti v. Uber Techs., Inc.*, 213 F. Supp. 3d 839, 845 (W.D. Tex. 2016) (finding a similarly-worded

delegation clause in Uber's contracts with its drivers was evidence of "a clear and unmistakable delegation of the authority to determine issues of arbitrability.").

Notwithstanding the clear and unmistakable language used here, JAMS declined to reach the issue owing to Uber's objection and the lack of any corresponding court order. This Court should accordingly find that the existence of a valid arbitration agreement is subject to the delegation clause in Uber's Terms of Use and order JAMS to arbitrate the issue.

**B. The Arbitration Agreement Covers This Dispute, But Again, That Too Is for an Arbitrator to Decide.**

The second prong in resolving a motion to compel arbitration is to determine whether the arbitration agreement encompasses the claims at issue. *See Nur v. K.F.C. USA, Inc.,* 142 F.Supp.2d 48, 50–51 (D.D.C. 2001). Any doubt should be resolved in favor of arbitration. *Sheet Metal Workers' Intern. Ass'n v. United Transp. Union*, 767 F. Supp. 2d 161, 176 (D.D.C. 2011) ("An order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.") (citation omitted). And, as a gateway question of arbitrability, this too can be subject to a delegation clause. *See Andresen*, 240 F. Supp. 3d at 149 ("[Wh]en a valid and enforceable delegation provision is in place, a court is prohibited from reaching the gateway question of arbitrability and must reserve that question for arbitral resolution."). In this case, either approach yields the same conclusion—arbitration.

The Arbitration Agreement here is drafted broadly. It speaks in terms of "any" and "all" disputes that in anyway "aris[e]" or "relat[e]" to the Terms of Use. This all-encompassing language naturally reaches Petitioner's claims that Uber misrepresented the safety of its ridesharing service. That service, after all, is the very reason the Terms of Service even exist. And as noted above, Uber's representations—which include everything from driver safety to the ease with which the app can be used in foreign countries—led Petitioner to believe it was safe to ride with Uber during his family's trip to Mexico. He relied on those representations (made and perceived in the U.S.) when he subsequently decided to use Uber in Mexico, all actions which touch upon the U.S. Terms of Use. To fall within the broad language of the Arbitration Agreement, Petitioner need not demonstrate anything further. *See Sheet Metal Workers' Intern. Ass'n,* 767 F. Supp. 2d at 176 "[A broad] arbitration clause ... encompasses all matters that touch upon the contract.") (citations omitted).

Uber's objection to arbitration before JAMS was based on its claim that the U.S. Terms and Conditions do not apply. But even if a good-faith dispute could be lodged on this issue, whether Petitioner's claims are covered by the Arbitration Agreement is a threshold question an arbitrator must decide. There, in reviewing a similarly worded delegation clause, the court held that a challenge to applicability of the agreement overall did not disturb the parties' consent to have an arbitrator decide gateway issues of enforceability. *See Rent-A-Ctr.*, 561 U.S. at 72 (because there was no challenge to the "delegation provision specifically, we must treat it as valid under

§ 2 [of the FAA], and must enforce it under §§ 3 and 4 [of the FAA], leaving any challenge to the validity of the Agreement as a whole for the arbitrator.").

The same analysis holds here. The parties have unmistakably agreed that an arbitrator shall have "exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable." Casey Decl. at Ex. 1, Section 2(a)(4). Uber has lodged no challenge or defense to the enforceability of this provision. It is thus for an arbitrator to decide whether Petitioner's claims are covered by the Arbitration Agreement. The Court should accordingly order JAMS to arbitrate the issue of whether this dispute arises under the U.S. Terms and Conditions.

**C. This Court Should Order Arbitration to Proceed Before JAMS in Washington, DC.**

Arbitration of the gateway issues in this case (and the dispute itself) should proceed before JAMS. Petitioner complied with the Arbitration Agreement and conferred with Uber regarding the selection of an appropriate arbitrator. Uber ignored these conferral attempts, even though Petitioner plainly stated that he would initiate arbitration before JAMS in Washington, DC. Though Uber stood silent, it has, in any event, never suggested that JAMS is an inappropriate provider under the Terms of Service. Rather, it objected to JAMS on the ground that an entirely different arbitration agreement should apply—a question that must be decided by the arbitrator in the first instance. *See supra*. Under § 5 of the FAA—which is incorporated in the Terms of Service—this Court should "designate and appoint" JAMS to determine whether the Terms of Service apply.

For disputes arising outside of California (like this one), Section 2(c) of the Terms of Service provides that:

> the parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises. . . . Once an arbitration provider is agreed upon or appointed, an Arbitrator shall be appointed. The Arbitrator will be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute. The Arbitrator will be selected by the parties from the applicable arbitration provider's roster of arbitrators. If the parties are unable to agree upon an Arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the Arbitrator in accordance with its rules.

Casey Decl. at Ex. 1, Section 2(c).

Under Section 2(e), "if [the claimant] reside[s] in the United States, the arbitration will be conducted in the county where [he] reside[s]." Under these metrics, JAMS fits the requirements. It is a well-respected neutral arbitration provider that has operations in Washington, DC, where Petitioner resides.[13] It also has a roster of potential arbitrators that includes retired judges and experienced practitioners licensed to practice in Washington, DC.[14] It satisfies the criteria required mandated by the Terms of Service.

---

[13] *See* https://www.jamsadr.com/locations/ (last visited Jun. 24, 2024).

[14] *See* https://www.jamsadr.com/neutrals/search?filters=custom_ss_tag_neutral_all_location%3Awashington_dc (last visited Jun. 24, 2024).

Uber has never expressed any objection to the use of JAMS as the arbitration provider under the Terms of Service. Rather, Uber objected to the application of the Terms of Service themselves, arguing that a different set of terms (ones that Petitioner never agreed to) should apply instead. But, as noted above, the Terms of Service include a delegation clause which, in turn, requires an arbitrator to decide this very issue. Because JAMS is an appropriate provider under the Terms of Service, and because those terms specifically permit either party to seek a court order appointing an arbitrator, this Court should appoint JAMS.

In any event, Uber should be estopped from raising any objection now to JAMS as the arbitration provider for this dispute. As set forth above, between January 19 and February 20, 2024, Petitioner made several attempts to confer with Uber to select a mutually acceptable arbitration provider. Uber failed to respond to any of these attempts. Petitioner finally unilaterally selected JAMS in Washington, DC, and informed Uber that if they received no response, Petitioner would assume Uber consented to JAMS.  Having received no response, Petitioner filed a demand for arbitration before JAMS in Washington, DC. Uber had several opportunities to raise any objections to the selection of JAMS through a conferral, as required by its own Terms of Service.  Having failed to do so, it should not now be permitted to raise any such objections.

<u>**REQUEST FOR RELIEF**</u>

Wherefore, Petitioner respectfully requests this Court:

(1) order the parties to arbitration under Uber's U.S. Terms of Use, including

of all threshold issues of arbitrability;

(2) appoint JAMS in Washington, DC as the designated arbitration provider;

and

(3) grant such other relief as the Court may deem just and proper.


Dated: June 25 2024,

Respectfully submitted,

By: <u>/s/  Stephanie A. Casey</u>
Stephanie A. Casey
D.C. Bar No. 984336
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Phone: (305) 476-7400
scasey@colson.com


*Counsel for Plaintiff*